1  Adam J. Krolikowski (SBN 202946)
   KROLIKOWSKI LAW FIRM
2  1200 Main Street, Suite H
   Irvine, California 92614
3  Tel.  (949) 269-1869
   Fac. (949) 269-1868
4

5  Attorneys for Plaintiff Craig F. Monteilh

6

7

8
                UNITED STATES DISTRICT COURT
9
                CENTRAL DISTRICT OF CALIFORNIA
10

11  CRAIG   F.   MONTEILH,   an )   Case Number:
    individual,                 )   SACV10-00102-JVS(RNBx)
12                              )   Hon. James V. Selna
              Plaintiff,        )
13                              )
                                )   **MOTION   TO   SET   ASIDE**
14                              )   **CONVICTION  OF  PLAINTIFF**
                                )   **CRAIG   F.   MONTEILH**
15  v.                          )   **AND/OR   PETITION   FOR**
                                )   **HABEAS CORPUS**
16                              )
    FEDERAL   BUREAU   OF )
17  INVESTIGATION, a government  )
    entity;  IRVINE  POLICE      )
18  DEPARTMENT,  a  government    )
    entity;  RON  CARR,  an       )
19  individual; BARBARA WALLS, an )
    individual   and DOES 1 to 100, )   Date: March 21, 2011
20  inclusive,                  )   Time: 1:30 p.m.
                                )   Dept. 10C
21            Defendants.       )

22  _____

23             **NOTICE OF MOTION AND MOTION**

24  PLEASE TAKE NOTICE that on March 21, 2011, at 1:30 p.m., or as

25  soon thereafter as counsel may be heard, defendant the Federal

26  Bureau of Investigation will bring on for hearing the within Motion

27  to Dismiss before the Honorable James V. Selna in Courtroom 10C

28  of the Ronald Reagan Federal Building and U.S. Courthouse, 411

1   West Fourth Street, Santa Ana, CA 92701-4516. Plaintiff

2   respectfully moves this Court for an Order, pursuant to 28 USC

3   2554, U.S. Constitution Article One, Section 9, and applicable

4   common law.  The Motion is made on the grounds that the State

5   Court lacked jurisdiction over Plaintiff to convict him due to his

6   Federal immunity to engage in undercover operations with the FBI

7   and Joint Terrorism Task Force.  Mr. Monteilh was the principle

8   operative on a national security operation. Further, the FBI and

9   United States forced Mr. Monteilh to enter into a plea agreement to

10  maintain operational security of Operation Flex, thus causing him

11  to unconstitutionally suspend his rights to habeas corpus.

12       This Motion is based upon this Notice of Motion and Motion;

13  the Memorandum of Points and Authorities attached hereto; and

14  any further arguments, evidence and grounds as may be advanced

15  in the future.

16                           KROLIKOWSKI LAW FIRM

17

18  Dated: February 15, 2011      _____

19                                Adam J. Krolikowski, Esq.
                                  For Plaintiff Craig F. Monteilh

20

21

22

23

24

25

26

27

28

---

# I.

## INTRODUCTION

The FBI engaged in "Operation Flex," which was initiated pursuant to Executive Order 12356. ASAC Barbara Walls was in charge of Operation Flex, directing it through the Orange County Joint Terrorism Task Force (including Ronald Carr, Frough Jahid and the Irvine Police Department) and Plaintiff Craig F. Monteilh. During Operation Flex, a line was crossed whereby the FBI and the named Defendants exercised their powers over Plaintiff Monteilh in an unconstitutional manner, ending in suspension of his right of habeus corpus and wrongful conviction and incarceration.  To begin to right the wrong, Mr. Monteilh motions the court to set aside his conviction and/or grant habeus corpus.

# II.

## JURISDICTION AND VENUE

1.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under federal law and the U.S. Constitution. Jurisdiction over the FBI is pursuant to 28 U.S.C. § 1346 and 28 U.S.C § 2679.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e); the acts and omissions alleged herein occurred in this district.

3.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 2254, et seq., U.S. Constitution Article One, Section 9, and applicable common law.

4.     If a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring

1  during its pendency would normally render the matter moot.

2  Questions of general public concern do not become moot by reason

3  of the fact that the ensuing judgment may no longer be binding on

4  a party to the action. (*In re William M.* (1970) 3 Cal. 3d 16, 23-25,

5  89 Cal. Rptr. 33, 473 P.2d 737).

6                                    **III.**

7                                 **PARTIES**

8       5.   Plaintiff CRAIG F. MONTEILH is a United States citizen

9  and a resident of the State of California.  Mr. Monteilh was

10 formerly employed by the Federal Bureau of Investigation ("FBI") in

11 the capacity as an undercover informant.

12      6.   Plaintiff is informed, believes and based thereon alleges

13 that Defendant FBI is an agency of the United States Government.

14 The FBI's headquarters is located at 935 Pennsylvania Avenue,

15 N.W., Washington, DC  20535.

16      7.   Plaintiff is informed, believes and based thereon alleges

17 that Defendant Irvine Police Department is an agency of the City of

18 Irvine, a municipal corporation under its present name, "City of

19 Irvine," organized and operating pursuant to its Charter and the

20 laws of the State of California.

21      8.   Plaintiff is informed, believes and based thereon alleges

22 that Defendant BARBARA WALLS is an individual employed by the

23 FBI at all times relevant herein is an Assistant Special Agent in

24 Charge at the Santa Ana branch office of the FBI located at 901

25 Civic Center Drive West, Santa Ana, California 92701.

26      9.   Plaintiff is informed, believes and based thereon alleges

27 that Defendant RON CARR is at all times relevant herein is a

28 Detective with the Irvine Police Department.

# IV.

## STATEMENT OF FACTS

10.   Mr. Monteilh began working with the FBI as a voluntary undercover informant on or about early 2004 in the investigative program known as Violent Crime, and specifically concerning Narcotics operations, Murder for Hire, and Bank Robberies.

11.   Mr. Monteilh worked with the FBI while directly supervised by his handlers Special Agent Tracy Hanlon and Special Agent Christopher Gicking.

12.   The FBI initially tasked Mr. Monteilh to perform work concerning its Narcotics investigative program of the FBI Criminal Division in early 2004.

13.   Mr. Monteilh was tasked by the FBI concerning the Narcotics investigative program to infiltrate drug trafficking groups and surreptitiously obtain information for use in prosecuting the individual group members for violations of the narcotics laws of the United States.

14.   The Narcotics investigative program was in conjunction with local law enforcement, the Organized Crime Drug Enforcement Task Force (OCDETF), High Intensity Drug Trafficking Area (HIDTA) Programs, and other FBI counter-drug resources which focus on significant criminal enterprises.

15.   The undercover informant work Mr. Monteilh performed under the Narcotics investigative program kept illicit drugs off the streets and resulted in arrests and convictions.

16.   The FBI and its agents commended the work performed by Mr. Monteilh and increased his tasking orders to include the Murder For Hire investigative program.

17.   The FBI Murder For Hire investigative program formally began when Murder For Hire became a specific federal crime in 1958.  The FBI typically works between 70 and 90 cases a year. The Murder For Hire investigations range from spurned lovers out for revenge to more organized gangs and crime groups that want to take out rivals and snitches, with the ultimate goal being prevention.

18.   Mr. Monteilh, as part of his taskings as an undercover informant for the FBI, engaged in a sting operation on or about March 2006.

19.   The sting operation involved the purchase, sale and distribution of illicit performance enhancing drugs (commonly referred to as steroids and human growth hormone) in the County of Orange and the trafficking of marijuana smuggled through Canada, targeting individual suspects including but not limited to Roxanne Veal, Troy Zuccolotto, Youth Tech Incorporated, Danielle Brinkman and Mary Brandolino Genovese.  Mr. Monteilh was gaining the confidence of individual suspects and, as he had done in the past, was surveilling and gathering intelligence for the eventual arrest and conviction of the suspects.

20.   Mr. Monteilh's involvement in the sting operation was placed on hold, however, because the FBI determined he was needed for a special operation dealing with National Security and Counterterrorism.

21.   Mr. Monteilh was informed that the FBI is part of a vast national and international campaign dedicated to defeating terrorism, working hand-in-hand with partners in law enforcement, intelligence, the military, and diplomatic circles to

1   neutralize terrorist cells and operatives here in the U.S. and to help
2   dismantle terrorist networks worldwide.

3          22.   Specifically, Mr. Monteilh was informed that the work,
4   should he choose to accept the assignment, would be for the
5   purpose of infiltrating, surveilling and obtaining intelligence to take
6   down high priority targets including but not limited to USAMA BIN
7   LADEN, AYMAN AL-ZAWAHIRI, ABDELKARIM HUSSEIN
8   MOHAMED AL-NASSER, and ADAM GADHAN.

9          23.   Mr. Monteilh, inspired by the opportunity to assist in
10  the protection of this great nation, agreed to be moved from
11  working with the Violent Crime investigative umbrella to the
12  National Security Branch, Counterterrorism Division, of the FBI.
13  Attached is Exhibit A, a true and correct copy of a Washington Post
14  article by national security correspondent Jerry Markon, referring
15  to law enforcement sources confirming Mr. Monteilh was trained
16  by the FBI and was promoted from drug and bank robbery cases
17  because his information was reliable and lead to convictions.  See,
18  Ex. A pages 3 and 4.

19         24.   The FBI assigned two new handlers, Special Agent Kevin
20  Armstrong and Special Agent Paul Allen with the FBI Orange
21  County Joint Terrorism Task Force, to deliver tasking orders to Mr.
22  Monteilh.

23         25.   From July 2006 to October 2007, the FBI tasking orders
24  for Mr. Monteilh concerning the National Security Branch,
25  Counterterrorism Division, implemented him as a human
26  intelligence operative within a secret surveillance program aimed
27  at spying on the Islamic community in the counties of Orange, Los
28  Angeles and San Bernardino.

26.   Mr. Monteilh was informed the secret surveillance program was called "Operation Flex" and was initiated pursuant to Executive Order 12356.  The FBI tasked Mr. Monteilh with assuming the identity of Farouk al-Aziz, a new Muslim convert of Syrian and French descent, under code name "Oracle."  A true and correct copy of correspondence from Mr. Monteilh to SA Allen evidencing the use of code name "Oracle" is attached as Exhibit B.

27.   Operation Flex was implemented through the National Security Branch of the FBI, using Mr. Monteilh as the center piece of this covert surveillance program, to continue and extend its post-9/11 wider surveillance program. A true and correct copy of an article from the LA Times concerning SA Ropel's testimony that Mr. Monteilh successfully infiltrated the Islamic community is attached as Exhibit C.

28.   The Assistant United States Attorney Dierdra Eliot gave Mr. Monteilh special permission and immunity, by and through a signed Federal document, to engage in jihadist rhetoric, including but not limited to conducting terrorist operations, possessing weapons and initiating conversations to further terrorist acts against the United States.

29.   Steven Kramer was FBI Legal Counsel for Operation Flex and he personally dictated a Non-Disclosure Agreement which references the privileges and immunities provided to Mr. Monteilh. The Non-Disclosure Agreement was signed by Mr. Monteilh, Steven Kramer and Barbara Walls on  behalf of the FBI and the United States. The Non-Disclosure Agreement is referenced in Exhibit D by Henry Felix of the Office of the United States Attorney General.

30.   Mr. Monteilh met with Special Agent Kevin Armstrong

and Special Agent Paul Allen to receive his tasking orders.  Mr. Monteilh was tasked by the FBI with infiltrating mosques in the counties of Orange, Los Angeles and San Bernardino, a task he successfully achieved.

31.   Mr. Monteilh was tasked by the FBI with becoming skilled in the Hadith and the Quran, the five pillars, and the sixth pillar of Islam.  Mr. Monteilh was tasked by the FBI with gaining the confidence of high priority targets, leading prayer in the mosques, dating Muslim women and engaging in sexual relations with Muslim women.  Mr. Monteilh was successful in performing these tasks. A true and correct copy of the certificate of achievement from Islamic Center of Irvine for Arabic language study is attached as Exhibit E. A true and correct copy of a tasking order from SA Allen to Mr. Monteilh regarding the tasks is attached as Exhibit F.

32.   On or about March 2, 2007, Mr. Monteilh received a telephone call from his handler Special Agent Paul Allen.  Mr. Monteilh was informed by Special Agent Paul Allen that he had received a call from an Irvine Police Officer assigned to the Orange County Joint Terrorism Task Force informing him that there was an active investigation on Mr. Monteilh for grand theft.  Mr. Monteilh was informed the complainants were the same person(s) he had infiltrated in the March 2006 sting operation.

33.   The FBI, through Special Agent Paul Allen, told Mr. Monteilh that he would be receiving a call from Irvine Detective Ron Carr and upon that call an interview would be scheduled by the Detective.

34.   The FBI, through Special Agent Paul Allen, further

instructed Mr. Monteilh that he was by no means to divulge his status as a confidential informant to Detective Carr or invoke his immunity because it would jeopardize "operational security" of Operation Flex.  Special Agent Paul Allen also told Mr. Monteilh that the Irvine Detective had direct knowledge that Mr. Monteilh was an active informant and was protected with immunity. See, Exhibit G, Verified Responses to Request for Admission from City of Irvine, Numbers 28, 59 and 61.  See, Exhibit H, Verified Responses to Request for Admission from Ron Carr, Number 100.

35.   Mr. Monteilh explained to the FBI, through Special Agent Paul Allen, that Detective Carr's investigation concerns prior work with the Narcotics investigative program of the Criminal Division and that disclosing his confidential informant status to Detective Carr would vindicate Mr. Monteilh as it had when such investigations by local law enforcement occurred before.

36.   On or about March 7, 2007, Detective Carr interviewed Mr. Monteilh in Irvine, California.  At the close of the interview, Detective Carr told Mr. Monteilh, "I am going to get you."

37.   Detective Carr and Detective Jahid were Irvine Police Department Intelligence Detectives (not Fraud Investigators) who worked with the Joint Terrorism Task Force and FBI ASAC Barbara Walls. See, Exhibit G, Response Numbers 4 and 19.  In a glaring contradiction Detective Carr denies he was an intelligence detective for the Irvine Police Department. See Exhibit H, Response Number 17. Detective Carr also denies Detective Frough Jahid was an intelligence detective for the Irvine Police Department. See, Exhibit H, Number 3.

38.   Mr. Monteilh told the FBI about the interview and the

statements made by Detective Carr.  The FBI again instructed Mr. Monteilh to mislead detectives and outright lie to detectives for the sake of "operation security" all the while assuring Mr. Monteilh the grand theft case would be taken care of in the exit strategy and Mr. Monteilh's immunity would cover all charges.  The FBI continued to give such assurances for several months.

39.   While the grand theft investigation of Detective Carr was being conducted, Mr. Monteilh was on probation through Case No. KA059040 in the Superior Court of California, County of Los Angeles, West Covina Courthouse.  Mr. Monteilh's Probation Officer, Officer Medina, was aware of Detective Carr's investigation of Mr. Monteilh, but told Mr. Monteilh's handlers he would not arrest Mr. Monteilh because he knew Mr. Monteilh's involvement was that of an FBI informant.  Special Agent Paul Allen also explained to Officer Medina that Mr. Monteilh was working on a national security operation and was protected by immunity.

40.   Mr. Monteilh, nonetheless, was concerned about remaining on probation and went to the West Covina Courthouse on April 13, 2007, to ask for early termination of his probation, which was denied.  Mr. Monteilh reported this to his FBI handlers. Thereafter, Special Agent Kevin Armstrong (a former Assistant United States Attorney) called Los Angeles County District Attorney Steve Cooley directly to have Mr. Monteilh's probation terminated early.  Mr. Monteilh was informed that this was necessary because any felony investigation of a probationer automatically disqualifies them from consideration for early termination of probation.

41.   On August 20, 2007, Deputy District Attorney Linda A. Chilstrom moved on behalf of the People of the State of California

for early termination of the probation of Mr. Monteilh, stating that Mr. Monteilh had given "very, very valuable information that has proven essential in an FBI prosecution."  A true and correct copy of the hearing transcript terminating the probation of Mr. Monteilh is attached hereto as <u>Exhibit I</u>.

42.   The undercover informant work Mr. Monteilh performed under Operation Flex resulted in arrests and prosecutions, including but not limited to Ahmadullah Sais Niazi (who was later released, possibly based on the FBI's handling of his case).  Mr. Monteilh's role as an informant was revealed by testimony of Special Agent Thomas J. Ropel III at the bail hearing of Ahmadullah Sais Niazi. (Ahmadullah Sais Niazi is a suspected terrorist for allegedly sending support to the Mujahadeen in Afghanistan; See <u>Exhibit J</u> with statements from US Attorney Dierdra Eliot.

43.   During the same time period, in connection with Operation Flex, the Irvine PD Intelligence and the OC-JTTF , Detective Jahid interviewed suspected terrorist Ahmadullah Sais Niazi in the spring of 2007. See, <u>Exhibit G</u>, Response Number 6.

44.   Part of the information discovered by Mr. Monteilh also concerned the storage of suspected bomb making materials at a certain mosque, which Mr. Monteilh reported to Special Agent Kevin Armstrong, Special Agent Paul Allen and Assistant Special Agent in Charge Barbara Walls.

45.   Mr. Monteilh is informed that  Assistant Special Agent in Charge Barbara Walls did not act on the information concerning bomb making materials for over three (3) weeks.  Mr. Monteilh is informed that when Assistant Special Agent in Charge Barbara

1  Walls finally obtained the necessary warrants to investigate the

2  bomb making materials, they were no longer there.  Mr. Monteilh

3  is informed that Assistant Special Agent in Charge Barbara Walls

4  was embarrassed and instead of accepting responsibility for her

5  error in judgment, called Mr. Monteilh a liar.  Mr. Monteilh is

6  informed it is at that point that Assistant Special Agent in Charge

7  Barbara Walls determined she would remove Mr. Monteilh from

8  the FBI Counterterrorism program and thereafter began to

9  conspire with Detective Ron Carr to set Mr. Monteilh up for felony

10  prosecution and conviction.

11      46.   On or about mid-March 2007, Detective Carr had been

12  instructed through members of the Orange County Joint Terrorism

13  Task Force at the Irvine Police Department not to pursue the grand

14  theft case against Mr. Monteilh because he was an asset.  See

15  Exhibit K, City of Irvine's Answer to the Complaint, page 3,

16  paragraph 9.  On or about September 17, 2007, Assistant Special

17  Agent in Charge Barbara Walls communicated with Detective Carr

18  and gave him the "green light" to proceed with seeking the arrest of

19  Mr. Monteilh, despite their knowledge of his status and history as

20  an FBI informant.

21      47.   Detective Carr recontacted Mr. Monteilh on or about

22  September 24, 2007, and taunted him, saying I can arrest you

23  whenever I want for violating your probation.  Detective Carr

24  became furious when he was informed by Mr. Monteilh that his

25  probation was terminated in August 2007.

26      48.   Mr. Monteilh was concerned and asked the FBI, through

27  his handlers, how the exit strategy was going to be implemented,

28  including but not limited the payment of arrearage, severance,

1    readjustment to the community, new identity, removing the

2    restraining order and dissolving the grant theft investigation. The

3    FBI offered no response and the handlers said, "I don't know."

4         49.   Mr. Monteilh is informed that in October 2007, Assistant

5    Special Agent in Charge Barbara Walls orchestrated the

6    diminishing of Mr. Monteilh's involvement in Operation Flex as the

7    high priority target Ahmadullah Sais Niazi already had a sealed

8    Federal indictment against him.

9         50.   Mr. Monteilh is further informed that Assistant Special

10   Agent in Charge Barbara Walls became paranoid that Mr. Monteilh

11   would speak to the press about the illegal activities directed by

12   Assistant Special Agent in Charge Barbara Walls' office of the

13   National Security Branch of the FBI.  Mr. Monteilh is informed that

14   the illegal activities Assistant Special Agent in Charge Barbara

15   Walls was concerned about coming to light were racial profiling,

16   religious profiling, instigating extremist rhetoric to entrap Muslims,

17   blackmailing Muslims to become informants, the breach of security

18   at Berlitz language center, Mr. Monteilh being armed to attend

19   mosques, Mr. Monteilh being told to engage in sexual relations

20   with Muslim women, misuse of surveillance devices in the Islamic

21   community and warrantless wiretapping.

22        51.   In November 2007, the Irvine Police Department SWAT

23   team assembled in strike formation outside the home of Mr.

24   Monteilh.  Mr. Monteilh, alarmed, quickly called his handlers on

25   the telephone and told them what he saw, and moments later

26   heard the words "stand down" and they left.  Mr. Monteilh asked

27   what that was about and the handlers said, "I don't know."  Mr.

28   Monteilh is informed that Detective Carr and Assistant Special

Agent in Charge Barbara Walls conspired and were responsible for this SWAT team incident occurring.

52.    On December 3, 2007, Detective Carr filed an "Order Requiring Penal Code Section 1275.1 Hearing and Notification of the District Attorney" for a warrant for the arrest of Craig F. Monteilh.  In the filing, Detective Carr requested that Deputy District Attorney Yvette Patko be present at every hearing and that a hold on the release from custody be placed on Mr. Monteilh.  A true and correct copy of the Arrest Application evidencing the above-referenced requests made by Detective Carr is attached hereto as Exhibit L.

53.    Detective Carr denies he made the request for Yvette Patko in his Answer. See, Exhibit K, page 3, paragraph 11, which impeaches his credibility in this case.

54.    Now, the District Attorney's office has refused to produce the criminal case file of Mr. Monteilh citing the federal official information privilege, which is typically reserved for national security. See, Exhibit M, a true and correct copy of a letter from the Office of the District Attorney dated July 2, 2010.

55.    The Public Defender's case notes reveal the District Attorney knew and possessed documentation that Mr. Monteilh was an informant for the FBI, but was instructed by the FBI and Barbara Walls not to dismiss the charges. The District Attorney referred to Mr. Monteilh as a "snitch" and "operative," then offered him a plea bargain for 3 years in prison, but no enhancements which were required by statute. See, Exhibit N, a true and correct copy of case notes of Public Defender Matthew Missakian. Mr. Monteilh is informed by FBI agent that Deputy District Attorney

Yvette Patko possesses documentation on FBI letterheads (several) outlining his national security work, immunity from prosecution and financial disclosures. This documentation is from the desks of Special Agent Tracy Hanlon, her supervisor, Agents from Operation Flex, and ASAC Barbara Walls.  The documentation also reveals the dissention between FBI field agents and FBI management, as well as commending letters from Costa Mesa Detective Kim, Deputy District Attorney/Assistant United States Attorney Joel Williams, and a damning letter from ASAC Barbara Walls.

56.   On December 12, 2007, Mr. Monteilh was surprised by an arrest and search warrant at his home by Detective Carr and Detective Jahid.  Mr. Monteilh was arrested.

57.   Mr. Monteilh was informed that the Deputy District Attorney Yvette Patko was seeking a conviction and sentence of 5 years 8 months for Craig Monteilh.  Mr. Monteilh's bail was set at $250,000 per the direction of Detective Carr and/or Assistant Special Agent in Charge Barbara Walls.  Mr. Monteilh is informed that Assistant Special Agent in Charge Barbara Walls made disclosure to Deputy District Attorney Yvette Patko of the financial status and records of payment from the FBI to Mr. Monteilh.

58.   Mr. Monteilh is informed that on the day of the arraignment, Deputy District Attorney Yvette Patko went to lunch with the complainant Danielle Brinkman, one of the suspects from the sting operation from March 2006.

59.   At the direction of Assistant Special Agent in Charge Barbara Walls, Mr. Monteilh was visited by at the Orange County Jail by Special Agent Kevin Armstrong (former Assistant United States Attorney) and FBI Legal Counsel Steven Kramer.  Mr.

1    Monteilh was instructed by the FBI not to take his case to trial

2    because he had signed a document FBI Legal Counsel Steven

3    Kramer referred to as the "Non-Disclosure Agreement" and would

4    face a lengthy time in Federal Prison if he did so.  An effort to

5    enforce the Non-Disclosure Agreement is attached hereto as

6    Exhibit D,  A true and correct copy of a communication from Henry

7    R. Felix, Associate General Counsel for the FBI, evidencing the

8    above-referenced "Non-Disclosure Agreement" that Mr. Monteilh

9    signed on October 5, 2007.

10        60.   Mr. Monteilh's handlers SA Armstrong and SA Allen

11   instructed Mr. Monteilh to keep copies of documents, despite the

12   Non-Disclosure Agreement, because "he might need them in the

13   future" and then presented him with the OCJTTF Coin for their

14   appreciation of all the work he performed in Operation Flex.  A

15   photograph which is a true and correct representation of the coin

16   is attached hereto as Exhibit O.

17        61.   Mr. Monteilh was forced, under the color of authority by

18   Barbara Walls, the FBI and its agents, to not invoke his complete

19   and operational immunity, to plead guilty to grand theft, suffer a

20   felony conviction and endure sixteen (16) months in prison for

21   work performed at the direction of the FBI.

22        62.   Mr. Monteilh was transported from the OC Jail by 6

23   sheriff's deputies assigned with the OCJTTF and driven to the FBI

24   Santa Ana office to be polygraphed while in wrist and leg

25   restraints.  The polygraph was ordered by ASAC Walls, in

26   conjunction with the Irvine Police Department and Detective

27   Ronald Carr, and done without the knowledge of Mr. Monteilh's

28   defense attorney Matthew Missakian, Esq. (Mr. Monteilh was

1    represented by the Office of the Public Defender during that time)

2    and Mr. Monteilh did not waive the right to counsel.

3         63.   Mr. Monteilh saw that Irvine Police Department

4    Detective Ron Carr and Detective Frough Jahid were present at the

5    polygraph examination.  Mr. Monteilh is informed that Detective

6    Carr and Detective Jahid are assigned to the Intelligence Division

7    of the Irvine Police Department. Detective Frough Jahid was the

8    arresting officer of record for Mr. Monteilh. See, <u>Exhibit P</u>, a true

9    and correct copy of the Pre-Booking Record.  It is also worth noting

10   that Detective Carr *denies* that Detective Jahid was present at Mr.

11   Monteilh's arrest. See, <u>Exhibit H</u>, response number 12. This is

12   another glaring inconsistency.

13        64.   Mr. Monteilh is informed, believes and based thereon

14   alleges that Detective Carr and Detective Jahid were instructed by

15   Chief Maggard to be present at the polygraph and were both told

16   that Mr. Monteilh is an FBI informant.

17        65.   Immediately prior to the polygraph starting, FBI legal

18   counsel Steven Kramer, Esq., informed Mr. Monteilh he had in his

19   possession a completed document which would cause the

20   immediate release of Mr. Monteilh from custody if he passed the

21   polygraph.

22        66.   After the polygraph, FBI agent Kevin Armstrong brought

23   Mr. Monteilh lunch from Ralph's grocery store and informed Mr.

24   Monteilh that ASAC Barbara Walls was once again reneging on her

25   promises and he would have to go back to jail.  Mr. Monteilh was

26   not shown the results of the polygraph.

27        67.   Mr. Monteilh is informed by FBI agents that the

28   polygrapher told Agent Tracy Hanlon that Mr. Monteilh never

should have been polygraphed under such conditions and that Mr. Monteilh has every legal right to sue the Bureau.

68.   Later, the same day after the polygraph, the Irvine Police Department officers went to speak with Otto Paul Burgi, Tyrone Rye, Voicu Gruia, Christopher Aragon and Khalil Hamdan and revealed the very information Mr. Monteilh had obtained from each of them.  At that point, Mr. Monteilh's life was placed in great danger and he could do nothing to protect himself.

## V.

## POINTS AND AUTHORITIES

Plaintiff may seek to have his conviction set aside or habeas corpus based upon 28 U.S.C. § 2254, et seq., U.S. Constitution Article One, Section 9, and applicable common law.  If a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot. Questions of general public concern do not become moot by reason of the fact that the ensuing judgment may no longer be binding on a party to the action. (*In re William M.* (1970) 3 Cal. 3d 16, 23-25, 89 Cal. Rptr. 33, 473 P.2d 737).  In this case, the question of the law enforcement tactics of the FBI, City of Irvine and District Attorney's office which result in coerced guilty plea are an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve.

Justice Souter's concurring opinion in *Heck v. Humphrey*, 512 U.S. 477, 499 (U.S. 1994), states the process of setting aside a conviction "neatly resolves a problem that has bedeviled lower

1    courts [citations] and law students (some of whom doubtless have

2    run up against a case like this in law-school exams). The

3    favorable-termination requirement avoids the knotty

4    statute-of-limitations problem that arises if federal courts dismiss

5    § 1983 suits filed before an inmate pursues federal habeas, and

6    (because the statute-of-limitations clock does not start ticking

7    until an inmate's conviction is set aside)." *Id.* at 499.

8        In 1963, the Supreme Court set forth the "appropriate

9    standard" to be applied by a "federal court in habeas corpus" when

10   "the facts" pertinent to a habeas application "are in dispute."

11   *Townsend v. Sain*, 372 U.S. 293, 312. We held that when "the

12   habeas applicant was afforded a full and fair hearing by the state

13   court resulting in reliable findings" the district court "ordinarily

14   should . . . accept  the facts as found" by the state-court judge. *Id.*,

15   at 318.  However, "if the habeas applicant did not receive a full and

16   fair evidentiary hearing in a state court, either at the time of the

17   trial or in a collateral proceeding," we held that the federal court

18   "must hold an evidentiary hearing" to resolve any facts that "are in

19   dispute." *Id.*, at 312.  We further "explain[ed] the controlling

20   criteria" by enumerating six circumstances in which such an

21   evidentiary hearing would be required: "(1) the merits of the factual

22   dispute were not resolved in the state hearing; (2) the state factual

23   determination is not fairly supported by the record as a whole; (3)

24   the fact-finding procedure employed by the state court was not

25   adequate to afford a full and fair hearing; (4) there is a substantial

26   allegation of newly discovered evidence; (5) the material facts were

27   not adequately developed at the state-court hearing; or (6) for any

28   reason it appears that the state trier of fact did not afford the

1  habeas applicant a full and fair fact hearing." *Id.*, at 313 (emphasis
2  added).

3      Three years later, in 1966, Congress enacted an amendment
4  to the federal habeas statute that "was an almost verbatim
5  codification of the standards delineated in *Townsend v. Sain.*"
6  *Miller v. Fenton,* 474 U.S. 104, 111, (1985). That codification read
7  in relevant part as follows: "In any proceeding instituted in a
8  Federal court by an application for a writ of habeas corpus by a
9  person in custody pursuant to the judgment of a State court, a
10  determination . . . of a factual issue, made by a State court of
11  competent jurisdiction . . ., shall be presumed to be correct, unless
12  the applicant shall establish or it shall otherwise appear, or the
13  respondent shall admit --

14  (1) that the merits of the factual dispute were not resolved in the
15  State court hearing;

16  (2) that the factfinding procedure employed by the State court was
17  not adequate to afford a full and fair hearing;

18  (3) that the material facts were not adequately developed at the
19  State court hearing;

20  (4) that the State court lacked jurisdiction of the subject matter or
21  over the person of the applicant in the State court proceeding;

22  (5) that the applicant was an indigent and the State court, in
23  deprivation of his constitutional right, failed to appoint counsel to
24  represent him in the State court proceeding;

25  (6) that the applicant did not receive a full, fair, and adequate
26  hearing in the State court proceeding; or

27  (7) that the applicant was otherwise denied due process of law in
28  the State court proceeding;

(8) or unless . . . the Federal court on a consideration of [the relevant] part of the record as a whole concludes that such factual determination is not fairly supported by the record." § 2254(d) (emphasis added).

As is clear from the statutory text quoted above, and as the District Court correctly stated, if any "one of the eight enumerated exceptions . . . applies" then "the state court's factfinding is not presumed correct." See, *Jefferson v. Upton*, 130 S. Ct. 2217, 2221 (U.S. 2010)

Based upon the foregoing, Mr. Monteilh respectfully requests the Court set aside his conviction, and grant such other relief as the Court deems appropriate.

## **PETITION**

69.   This petition concerns a conviction.

70.   Places of detention were:

  a. Orange County Main Jail

  b. Wasco State Prison

  c. Coalinga Community Correctional Facility

71.   Place of conviction: Superior Court of California, County of Orange

72.   Sentence: 16 Months State Prison

73.   Conviction on which the petition is based:

  a. Grand Theft, 2 Counts

74.   Nature of offenses involved (include all counts):

  a. Count 1, Penal Code § 487(a) - Grand Theft

  b. Count 3, Penal Code § 487(a) - Grand Theft

75.   Case number: 07HF2373

76.   Date of conviction: February 29, 2008

MOTION/PETITION OF CRAIG MONTEILH        USDC, CENTRAL DISTRICT
CASE NO. SACV10-00102-JVS(RNBx)

-22-

77. Date of sentence: February 29, 2008

78. Length of sentence counts:

    a.   16 Months State Prison

79. Plea: Guilty

80. As discussed above, due to the Non-Disclosure Agreement and fear of the threats made by the FBI and its agents, no prior appeals or petitions for habeas corpus had been filed.

81. The grounds for this Petition are that Mr. Monteilh was convicted in violation of the Constitution and laws of the United States, specifically 28 U.S.C. § 2254, et seq., U.S. Constitution Article One, Section 9, Amendment 5 to the U.S. Constitution and applicable common law. As set forth in the above-stated facts, Mr. Monteilh had federal immunity, but was forced to plead guilty to alleged crimes from which he was immune. The FBI, through Steven Kramer and Barbara Walls, orchestrated the arrest and plea bargain of Mr. Monteilh leading to his conviction and incarceration.

82. For the reasons stated above, Mr. Monteilh prays the Court grant this Petition, or alternatively Motion to Set Aside Conviction, and all relief to which he may be entitled in this proceeding.

KROLIKOWSKI LAW FIRM

Dated: February 15, 2011

Adam J. Krolikowski, Esq.
For Plaintiff Craig F. Monteilh

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 15, 2011

Craig F. Monteilh